Weldon, J.,
delivered the opinion of the court:
The claimants, in May, 1882, were the joint owners of the American ship Mariposa, which sailed from the port of San Francisco to the port of Liverpool, arriving at the last-mentioned place in the early part of September, 1882.
The crew was composed of twenty-two persons, consisting of master, three mates, steward, cook, and sixteen seamen, all of whom had been employed at the port of San Francisco for the port of Liverpool and back to the United States, the voyage not to exceed twenty-four months. A bonus, as it is claimed, of something over $200 had been given to each of the seamen; and for the wages during the voyage they were by the shipping articles to receive the sum of $2 per month. On reaching Liverpool on the 3d of September seventeen of the crew deserted from the said ship. The officers in charge of the ship, made no report of such desertion, nor does it appear that they attempted to prevent the same; but in about a month after, the ship having been sold, it became necessary that the consul should deliver to the purchaser one-half of the ship’s register ;> and thereupon, in the performance of that duty, said consul, at the port of Liverpool, assessed against said ship the sum of $1,328, which was paid by the captain under protest, and *163 to recover that suta this suit was commenced by the owners of said ship.
The money, after being collected by said consul, was paid into the Treasury of the United States. The action of the con-. sul in making the assessment is based upon the consular regulation as promulgated in May, 1881. The clauses affecting this case are as follows:
“ Pah. 255. It has already been said (paragraph 193) that the shipping articles are deemed to contain all the conditions of the seaman’s contract with the ship. It is found, however, that seamen discharged in foreign ports are sometimes credited on the ship’s books at a merely nominal rate, and the relief fund not unfrequently suffers detriment in consequence of this device to avoid the payment of extra wages in full. Consular officers will therefore be watchful to thwart such practices in future, and in any case where the return made by the master fraudulently disagrees with the customary rate of compensation in the marine service they are instructed to exact the highest rate of wages paid to any seaman shipped for the voyage, or the sum actually agreed to be given him at his shipment, if it can be ascertained, whatever may be the sum falsely stated in the articles.”
u Par. 243. In cases of doubt, in which from any cause the ■consular officer is unable to decide to his satisfaction whether the extra wages should be collected or not, it will be the preferable and safer course for him to require their payment. The master or agent of the vessel should be permitted to make the payment under protest, if he shall see fit. A full statement of the facts should be promptly communicated to the Department ■of ¡State, when the case will be examined, aud restitution will be made if the circumstances are deemed to warrant it. It is desirable, also, that a like report should be made to the Fifth Auditor of the Treasury, to accompany the quarterly relief return to that officer.”
“ Par. 295. The circumstance that higher wages are now paid to seamen shipped in the United States than to seamen shipped in many foreign ports is known to be taken adv vantage of by masters to rid the vessel of the crew engaged in a home port, and to ship a new crew abroad at a lower rate •of wages. It is understood that to this end desertion is often permitted or connived at, that extra liberty is granted in the expectation that the seamen will not return to duty; or that, if he remains by the vessel, harsh and unusual tasks are imposed or other improper measures taken to incite him to desert. These facts, together with the additional facts that desertions have of late largely increased, and that the provisions for the relief of destitute seamen have in many instances been injudiciously used for the relief of deserters, make it necessary to enjoin *164 upon consular officers to take every proper measure to discourage and defeat any proceedings on the part of masters under which seamen are permitted or forced to desert, and subsequently come upon the consulate for relief. And with this view they are forbidden to certify the desertion list of any master until it is satisfactorily shown that the desertion was not consented to or abetted by the master or his officers or was not made justifiable by the conduct on their part towards the seamen, and that all proper efforts were made to recover and secure the deserter.”
“ Par. 299. It is well known that masters often neglect to report desertions until a considerable period after' they occur or until the vessel is about to sail, and that consequently no effort is made, or can successfully be made, for the recovery of the deserters, who subsequently come upon the consulate. In order, therefore, to aid in the enforcement of these regulations, the regulation by which the masterpf a vessel is required to report the desertion to the consular officer within forty-eight hours after it has occurred must be strictly insisted upon. If the master neglects so to report the desertion the consular officer is authorized and directed to deeline to certify the desertion on the crew-list. He may, however, formally discharge the seaman, but only upon the condition of the payment of the three months’ extra wages. In the event that it shall afterwards appear in such a case that the omission to report the desertion was unavoidable on the part of the master, or that the collection of the extra wages was, under the particular circumstances, inequitable, a full statement of the facts should be submitted to the Department of State with a view to the remission of the extra wages, if it shall be deemed proper. The consular officer, however, is not authorized in his discretion to forego the collection of the extra wages pending the submission of the case to the Department, but is instructed to exact them. If restitution is subsequently made it will be done through the proper officer of the Treasury Department on a report from the Department of State.”
The issue is to be determined by the application of the consular regulations in force at the time the assessment was made. It is insisted by counsel of the claimant that the desertion on the part of the crew was bona fide, and not collusive with the officers of the ship. It is one of the remarkable phases of the transaction that they should all desert at the same time. Whatever may be said as to the officers, it is certainly clear that the men acted from a concert of purpose, as they all did the same act, substantially at the same moment. It is strange, if they were impressed with the belief that their leaving involved the ordinary consequence of desertion, that without any exception all did desert. The desertion on the part of the men *165 was permitted and acquiesced in by the officers of the ship. No effort was made to reclaim the crew, and no report was made to the consular office of the desertion.
Those facts, we think, bring the transaction within the letter and spirit of the regulations. It is said the amount paid to the men on leaving the port of San Francisco was paid as a bonus; not as wages; and formed no part of the wages to be paid the sailors. If that be true, the compensation of $2 per month was an unconscionable bargain with the crew, as the pay of ordinary seamen at that time was at least the amount assessed by the consul. The amount of $2 per month was a “ fraudulent disagreement ” with the customary and actual rate of compensation in the marine service within the meaning of paragraph No. 255 of the consular regulations of 1881.
It is the judgment of the court that the petition be dismissed.